IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Cheryl Dawn Morton, | ) | Civil Action No. 8:16-cv-232-MBS-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2] For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

## PROCEDURAL HISTORY

On December 14, 2011, Plaintiff filed applications for DIB and SSI, alleging disability beginning May 1, 2011.  [R. 156–73.]  The claims were denied initially and upon reconsideration by the Social Security Administration ("the Administration").  [R. 53–72,

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

98–101.] Plaintiff filed a request for hearing before an administrative law judge ("ALJ"), and on March 25, 2014, ALJ Clinton C. Hicks conducted a hearing on Plaintiff's claims. [R. 28–51.]

On June 27, 2014, the ALJ issued his decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act ("the Act"), from May 1, 2011, through the date of the decision. [R. 12–23.] At Step 1[3], the ALJ found Plaintiff meets the insured status requirements of the Act through December 31, 2014, and had not engaged in substantial gainful activity since May 1, 2011, the alleged onset date. [R. 14, Findings 1 & 2.] At Step 2, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, osteoarthritis, urinary incontinence (night only), degenerative disc disease, and hypertension. [R. 14, Finding 3.]

At Step 3, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. [R. 14, Finding 4.] The ALJ specifically considered Listings 12.04 and 12.06. [*See Id.*] Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> . . . to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except sit/stand, change position twice/hour; no climbing ropes/ladders/scaffolds; occasional climbing ramps/stairs; no overhead lifting; simple routine repetitive tasks (nonproduction environment); frequent, not constant handling, and fingering bilaterally.

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

[R. 16, Finding 5.] Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform her past relevant work. [R. 21, Finding 6.] In light of Plaintiff's age, education, work experience, and RFC, the ALJ determined based on vocational expert (VE) testimony that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 22, Finding 10.] Thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from May 1, 2011, through the date of the decision. [R. 22, Finding 11.]

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council which denied review on November 23, 2015. [R. 2–4.] Plaintiff commenced an action for judicial review in this Court on January 25, 2016. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and contains legal errors warranting the reversal and remand of the case. [*See* Docs. 13, 15.] Specifically, Plaintiff contends the ALJ committed reversible error by:

> (1) making an assumption about Plaintiff's failure to pursue treatment without the requisite consideration in accordance with SSR 16-3p where Plaintiff had difficulty affording treatment;[Doc. 13 at 15–18, Doc. 15 at 1–7.]

> (2) discounting Plaintiff's testimony (finding it not entirely credible) based on notations in medical records that she was stable and her impairments were controlled;[Doc. 13 at 18–20, Doc. 15 at 7–12.]

> (3) and failing to consider all of Plaintiff's severe and non-severe impairments in combination when determining the RFC. [Doc. 13 at 20–22, Doc. 15 at 12–14.]

The Commissioner contends the ALJ's decision should be affirmed because there is substantial evidence of record that Plaintiff was not disabled within the meaning of the

Act. [*See* Doc. 14.]  Specifically, the Commissioner contends the ALJ properly considered Plaintiff's conservative treatment as one factor; and, if there was error in failing to discuss her inability to afford treatment, it is harmless. [Doc. 14 at 5–8.] The Commissioner also contends the ALJ properly relied on notations that Plaintiff's impairments were stable and controlled when considering Plaintiff's credibility; and, if there was error, it is harmless. [*Id*. at 8–10.] And, the Commissioner alleges the ALJ properly considered the combination of all of Plaintiff's impairments in the RFC determination.  [*Id*. at 10–12.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76

4

F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).   Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).   Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).   Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."   *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).   *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir.

5

1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

6

> The court may . . . at any time order additional evidence to be
> taken before the Commissioner of Social Security, but only
> upon a showing that there is new evidence which is material
> and that there is good cause for the failure to incorporate such
> evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).  A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court.  *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact.

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

*Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).   The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the

claimant from having substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider

9

the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

**C.**    ***Meets or Equals an Impairment Listed in the Listings of Impairments***

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[5]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

_____

[5]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31

---

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. 20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

(4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations). When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines. *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe

into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).   The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c).   Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.   *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. §§ 404.1517, 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

14

**V.    Pain**

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs."  *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  Indeed, the Fourth

15

Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

**APPLICATION AND ANALYSIS**

**Relevant Medical History**[8]

On March 28, 2011, Brian Snyder, D.O. ("Dr. Snyder"), of Catawba Family Medicine, evaluated Plaintiff for follow-up of her left upper extremity radiculitis.[9] Dr. Snyder reviewed Plaintiff's blood pressure logs. He refilled her Tenoretic and gave her a note for light duty and noted no edema in extremities. [R. 278.]

On June 7, 2011, Julie Bowers, a nurse practitioner at Catawba Family Medicine, evaluated Plaintiff for neck and back pain. Plaintiff reported that her blood pressure readings were in the 130s/80s at home. Plaintiff also reported fatigue, headaches, back pain, neck pain, right foot pain, depression, anxiety, and stress. Ms. Bowers found spinal tenderness and positive muscle spasms; and she noted Plaintiff was alert, oriented, with memory intact. Ms. Bowers' assessment was right foot pain, neck pain, anxiety disorder, chronic pain syndrome, and uncontrolled hypertension. Ms. Bowers prescribed Lisinopril, Klonopin, Lortab, and a reduced range of Tenoretic. [R. 276–77.]

On July 28, 2011, Dr. Snyder reevaluated Plaintiff. Dr. Snyder indicated that Plaintiff's right foot was tender with minimal erythema about the 5th MTP joint; and the right lower extremity had no joint or limb tenderness to palpation, no edema present. She admitted anxiety but denied depression or behavioral problems.  His assessment was anxiety disorder, glaucoma, benign essential hypertension, and ankle and foot pain in joint;

---

[8]Plaintiff's opening brief medical evidence is utilized partially because the Commissioner adopted that statement of facts related to the medical evidence. [Doc. 14 at 2.]

[9]The first record from Dr. Snyder in the file is a follow-up visit dated February 16, 2011. [R. 280.] On February 28, 2011, Dr. Snyder noted degenerative disk disease, hypertension, 9 pills short / discussed at length, no edema in extremities. [R. 279.]

and she appeared well-nourished, well developed, alert, in no acute distress. Dr. Snyder prescribed Mobic and Celexa. He also urged Plaintiff to schedule an eye examination as soon as financially possible. [R. 261–63.]

On September 19, 2011, Plaintiff had a radiological test of her lumbar spine which showed slight convex right scoliosis without acute findings. [R. 270.] The report noted "the pedicles and transverse processes are normal; the SI joints are normal; vertebral body heights and disc spaces are preserved." [*Id*.] On the same date, a radiological test was performed on her left shoulder, and no acute abnormalities were found [R. 271.]

On September 26, 2011, Plaintiff called Dr. Snyder's office for worsening neck pain going down her arms. Dr. Snyder advised her to increase her dose of hydrocodone. [R. 267.]

On December 7, 2011, Rajesh Kedar, M.D. ("Dr. Kedar"), evaluated Plaintiff to establish care; her blood pressure was 126/70. Plaintiff reported neck, shoulder pain, anxiety, panic attacks, and PTSD. Dr. Kedar refilled her prescription for Klonopin and referred her to mental health. He took right shoulder and cervical spine x-rays which showed cervical spondylosis and degenerative disc disease of C5-7 and normal right shoulder. [R. 284–86, 290.]

On January 9, 2012, Plaintiff reported that she did not go to mental health because they were "done with her." Her blood pressure was 120/80. Dr. Kedar indicated that Plaintiff's cervical spine pain was radiating into her right arm. Dr. Kedar diagnosed myalgia and myositis. He advised use of heat and massaged, reducing stressful activities, and strengthening exercises. Dr. Kedar indicated that Plaintiff could not afford an MRI and he refilled her hydrocodone. Regarding Plaintiff's anxiety, Dr. Kedar discussed the interaction

19

between chronic pain and stress; he found she was negative for psychiatric symptoms, no unusual anxiety or evidence of depression. Plaintiff complained of side effects from several offered medications for anxiety. Dr. Kedar refilled her Klonopin but indicated that she would need to see a psychiatrist. [R. 287–89.]

On March 7, 2012, Harriett Steinert, M.D. ("Dr. Steinert"), performed a consultative examination of Plaintiff at the Commissioner's request. Plaintiff reported pain in her neck and lumbar spine. Plaintiff indicated that she had been suffering from neck pain for five years. She indicated that her neck pain was present all the time and radiated into her shoulders and down between her shoulder blades. Plaintiff indicated that she had the pain in her lumbar spine for about twenty years. Plaintiff reported that it was present all the time and radiated into her left hip and occasionally down her left leg into her foot. Dr. Steinert noted that Plaintiff had not had an MRI of her neck or lumbar spine. Plaintiff reported that she could sit for 15-20 minutes and walk for about a mile. Plaintiff indicated that she was also told that she had scoliosis and arthritis in her neck. Plaintiff reported also having pain in her left knee and thought it was arthritis. Plaintiff reported anxiety but denied depression. Dr. Steinert noted that Plaintiff had never been hospitalized for mental illness but used to see a therapist. Dr. Steinert indicated that Plaintiff also suffered from glaucoma and cataracts in both eyes and was taking medication for hypertension and GERD. Dr. Steinert elicited Plaintiff's social history, family histories, and medications. Dr. Steinert indicated that Plaintiff's blood pressure was 147/107 and that her visual acuity was: R-20/50, L-20/40, both-20/30 with glasses. Dr. Steinert found Plaintiff to be pleasant and cooperative; she was well-nourished, well-developed, and in no acute distress. Plaintiff was able to get on and off the examination table without difficulty by herself. Dr. Steinert indicated that Plaintiff

20

had full range of motion in her cervical spine without tenderness to palpation of the neck and full range of motion of all joints in all four extremities. Plaintiff complained of pain with movement of her right shoulder and her left knee. Dr. Steinert found no tenderness to palpation of any joints, no swelling, no inflammation, no deformity, no sensory or motor deficits, and no muscle atrophy. Dr. Steinert indicated that Plaintiff could flex at the waist to 90 degrees, extend fully, and laterally flex fully. Dr. Steinert found no obvious scoliotic curvature and no tenderness to palpation of the spine or paraspinous muscles. Straight leg raises were negative bilaterally and Plaintiff was able to walk across the room without an assist device with a normal gait; deep tendon reflexes were equal in all extremities; grip strength was normal and equal in both hands (5/5). Dr. Steinert indicated that Plaintiff was appropriately oriented and was capable of handling her own personal financial and legal affairs. Dr. Steinert indicated that Plaintiff's limitations of activities of daily living and work activity was, "She has pain in her neck and lumbar spine." Dr. Steinert indicated that Plaintiff's diagnoses were anxiety; chronic neck and lumbar spine pain of uncertain etiology; glaucoma; cataracts; GERD. [R. 292–93.]

On March 16, 2012, Julia Yaraei, M.D. ("Dr. Yaraei"), of Community Medicine Foundation, Inc., evaluated Plaintiff to reestablish care. Plaintiff reported that she had recently lost her insurance and that she had applied for disability. Dr. Yaraei reviewed Plaintiff's medications and histories. Dr. Yaraei found Plaintiff to appear older than her stated age and to be thin. Plaintiff's blood pressure was 156/99. Dr. Yaraei found lumbar and sacral paraspinous tenderness, spinal tenderness, and bilateral shoulder tenderness. Plaintiff was somewhat anxious and tremulous. Dr. Yaraei's diagnoses included chronic cervicalgia, chronic paresthesia, chronic anxiety, and uncontrolled hypertension. After

signed a controlled substances contract Dr. Yaraei refilled Plaintiff's pain medications including hydrocodone and Neurontin and added diclofenac. Dr. Yaraei also continued Plaintiff's medications for glaucoma, GERD, anxiety, and hypertension. [R. 298–300.]

On April 16, 2012, Jacques Days, M.D. ("Dr. Days"), of Community Medicine Foundation, Inc., evaluated Plaintiff for hypertension, anxiety, and back pain; her blood pressure was 133/94. Plaintiff reported finding relief for back pain and anxiety with use of clonazepam, Voltaren, and Lortab, with no side effects to the drugs. Dr. Days found Plaintiff to have lumbar and sacral paraspinous tenderness, tenderness over her spine, scoliosis with concavity to the left, apparent pain with attempt at rising from her seat, and an antalgic gait. Plaintiff also appeared somewhat anxious and tremulous; she was alert and oriented. Dr. Days refilled Plaintiff's hydrocodone, diclofenac, Neurontin, and clonazepam and continued her other medications. [R. 308–09.]

On July 11, 2012, Plaintiff underwent a dexa bone scan which showed osteoporosis. [R. 319.]

On July 13, 2012, Dr. Days evaluated Plaintiff for hypertension, anxiety, and back pain. Plaintiff complained of chronic back and shoulder pain. She also reported panic attacks with palpitations, chest tightness, dizziness, and nervousness. Dr. Days noted that Plaintiff's blood pressure was 148/90 and Plaintiff complained that she had inadequate blood pressure control. Dr. Days found Plaintiff to have lumbar and sacral paraspinous tenderness, tenderness over her spine, scoliosis with concavity to the left, apparent pain with attempt at rising from her seat, an antalgic gait, and pain with shoulder abduction. Dr. Days's assessment was uncontrolled hypertension, uncontrolled shoulder pain, controlled anxiety, and controlled lower back pain. Dr. Days continued Plaintiff's medications,

including hydrocodone, clonazepam, Neurontin, and Flexeril and added Miacalcin for Morton's osteoporosis; he noted that she has no side effects with her back pain and anxiety prescriptions. [R. 320–21.]

On August 14, 2012, Dr. Days evaluated Plaintiff for follow-up of hypertension, anxiety, and back pain. Her blood pressure was 136/89; she was alert and oriented.  He found Plaintiff to have lumbar and sacral paraspinous tenderness, tenderness over her spine, scoliosis with concavity to the left, apparent pain with attempt at rising from her seat, an antalgic gait, and pain with shoulder abduction. Dr. Days indicated that Plaintiff appeared somewhat anxious and tremulous. He continued Plaintiff's medications; he noted that her prescriptions for back pain and anxiety had no side effects. [R. 324–25.]

On September 12, 2012, April Logan, Dr. Days's physician's assistant, evaluated Plaintiff for worsening pain in her upper back, low back, and arms; her blood pressure was 118/84. Plaintiff indicated that her pain occurred intermittently and described it as shooting. Plaintiff reported that her symptoms were aggravated by lifting and movement and relieved with pain medication. On examination Ms. Logan found lumbar spine tenderness; painful range of motion in Plaintiff's right shoulder; full range of motion left shoulder; appropriate mood and affect. Ms. Logan continued Plaintiff's medications and refilled her clonazepam, diclofenac, hydrocodone, and Flexeril. [R. 326–27.]

On November 8, 2012, Dr. Days evaluated Plaintiff for lumbago and anxiety; her blood pressure was 129/88. He continued her current medications. [R. 329–30.]

On December 5, 2012, Jerell Chua, M.D. ("Dr. Chua"), of Community Medicine Foundation, Inc., evaluated Plaintiff for complaints of chronic pain. Plaintiff reported that she had pain "everywhere" and "all the time." Plaintiff also reported extremity weakness

and anxiety. Her blood pressure was 143/92. Dr. Chua found Plaintiff to have tenderness in the subacromial bursa and coracoid. He found positive Speed's, Hawkins, and crossover tests. Dr. Chua also found Plaintiff to have decreased range of motion in all of planes of motion in the right shoulder. Dr. Chua noted that Morton appeared anxious; had an appropriate mood and affect. He administered a right shoulder subacromial space injection. Dr. Chua refilled Plaintiff's medications including Lortab, clonazepam, and diclofenac. [R. 331–34.]

On January 7, 2013, Dr. Days evaluated Plaintiff for chronic back pain with increased break-through pain; had appropriate mood and affect. Plaintiff reported that her hand and wrist pain was aggravated by activities such as grasping and opening jars and turning door knobs. Dr. Days added de Quervain's disease to Morton's diagnoses and refilled her medications. [R. 335–38.]

On February 6, 2013, Dr. Chua evaluated Plaintiff for follow-up of chronic pain and anxiety. Plaintiff reported increased pain in her left shoulder since having improvement in her right shoulder. Plaintiff's blood pressure was 153/98. Dr. Chua indicated that Plaintiff's overall appearance was older than her stated age. He found Plaintiff to have positive Obrien's, Speed's, and Yergason's tests in the left shoulder. Dr. Chua adjusted Plaintiff's Vicodin prescription due to the changed dose being more affordable. He also refilled her Klonopin and administered a left bicep tendon injection. [R. 339–43.]

On March 6, 2013, Dr. Chua indicated that Plaintiff's left shoulder was much improved after her bicep tendon injection but that her right bursa injection "didn't fare so well." Plaintiff complained of anxiety, back pain, and joint pains. Her blood pressure was

146/96. Dr. Chua refilled Plaintiff's hydrocodone and continued her other medications. [R. 346–49.]

On April 3, 2013, Dr. Chua noted that Plaintiff wanted another shoulder injection but that she had to cancel her previous injection appointment. Dr. Chua indicated that Plaintiff appeared anxious; her blood pressure was 119/95; had appropriate mood and affect. He continued Plaintiff's medications and recommended a 2 week follow-up appointment for injections. [R. 350–54.]

On May 1, 2013, Dr. Chua evaluated Plaintiff for chronic pain and anxiety; her blood pressure was 124/86. He noted that Plaintiff had been unable to come to her injection appointment due to finances and indicated that her chronic conditions were otherwise stable. Dr. Chua continued Plaintiff's medications and recommended that she follow-up in one month for shoulder injection. [R. 360–63.]

On May 29, 2013, Dr. Chua evaluated Plaintiff and indicated that Plaintiff's right shoulder had tenderness in the subacromial bursa; her blood pressure was 128/98. Dr. Chua administered an injection in her right shoulder and continued her medications including clonazepam and hydrocodone. [R. 365–67.]

On June 28, 2013, Dr. Chua evaluated Plaintiff for anxiety and medication refills. Plaintiff reported that her functioning was "somewhat difficult." Plaintiff presented as anxious and had fearful thoughts. She reported that her anxiety was aggravated by social interactions and that the interventions she had tried were not providing relief. Dr. Chua indicated that Plaintiff's level of distress was anxious. He ordered blood work and continued her medications; her blood pressure was 100/60. [R. 368–72.]

On July 26, 2013, Dr. Chua evaluated Plaintiff for anxiety and back pain. Plaintiff reported that her anxiety was improved from her initial symptoms but functioning was still somewhat difficult. She reported that her back pain occurred intermittently and was aggravated by movement. She indicated that her pain was in her back and hips and that she had weakness in her arms because of the pain preventing her from using her arms fully. Plaintiff's blood pressure was 152/92. Dr. Chua refilled her hydrocodone and clonazepam. [R. 375–79.]

On August 21, 2013, Plaintiff reported increased anger and mood changes with metoprolol. She also complained of anxiety. Dr. Chua indicated that Plaintiff appeared chronically ill and frail; her blood pressure was 130/88. He refilled Plaintiff's medications and added nortriptyline. [R. 383–87.]

On September 18, 2013, Dr. Chua noted that nortriptyline seemed to be working better for Plaintiff. He noted that Plaintiff was also still taking Chantix which she reported was "working okay." Her blood pressure was 142/84. Dr. Chua continued all of her medications. [R. 392–96.]

On October 23, 2013, Dr. Chua evaluated Plaintiff for right arm pain, anxiety, and chronic pain; her blood pressure was 138/80. Plaintiff reported pain in her neck, shoulders, wrists, and hands. He discussed the problem of her lack of image pathology (XR of b/l hands 6/5/12 are negative); noted that if no imaging available inability to justify opioid tx; and refilled her medications. [R. 397–401.]

On November 27, 2013, Dr. Chua evaluated Plaintiff for chronic pain and anxiety. He found Plaintiff to have very restricted cervical muscles on examination. Dr. Chua

ordered updated x-rays of Plaintiff's cervical and lumbar spines. He increased her dose of nortriptyline and continued her other medications. [R. 402–06.]

On December 27, 2013, Lalonda M. Graham, M.D. ("Dr. Graham"), another physician in Dr. Chua's office, evaluated Plaintiff for anxiety and back pain. Plaintiff reported anxious and fearful thoughts, difficulty staying asleep, and panic attacks. Dr. Graham indicated that Plaintiff had a good response to medication and that her anxiety was associated with chronic pain. Plaintiff also reported persistent pain in her upper back, gluteal area, neck, and shoulders. She indicated that her pain was radiating down her left arm and that her symptoms were aggravated by standing, walking, and using her left arm. Dr. Graham indicated that Plaintiff had not gotten her x-rays yet but had gotten enough money from Christmas to cover the costs of getting x-rays. Plaintiff's blood pressure was 140/86. Dr. Graham reviewed and continued her medications. [R. 407–11.]

On January 24, 2014, Dr. Chua evaluated Plaintiff and added a request for her right shoulder to be x-rayed as well. [R. 412–13.]

On January 27, 2014, Plaintiff had cervical spine x-rays which showed degenerative disc disease at C5-6 and C6-7 with osteophytes and sclerosis. [R. 414.] Her right shoulder x-rays were normal appearing. [R. 422.] Plaintiff also had lumbar spine x-rays which showed mild facet arthrosis and minimal listhesis; no other abnormality detected. [R. 423.]

On February 3, 2014, Dr. Chua evaluated Plaintiff for follow-up of chronic pain and reviewed her x-rays; her blood pressure was 122/60. She reported tolerating nortriptyline and sleeping better but not noticing any change in her mood. Dr. Chua found Plaintiff to have restricted cervical muscles. He continued her medications including diclofenac, Lortab, gabapentin, Flexeril, and Klonopin. Dr. Chua also noted that she would benefit from

27

Cymbalta but would need to wait until she got insurance to get that medication and that she needed an updated eye examination for her glaucoma. [R. 415–19.]

**ALJ's Discussion**

With respect to the medical evidence of record, the ALJ stated the following:

> The medical evidence of record reveals that the claimant underwent brief treatments at Catawba Family Medicine, with Brian R. Snyder, D.O. On February 16, 2011, Dr. Snyder noted that the claimant complained of neck pain, which radiates down the left upper extremity. Dr. Snyder's assessment of the claimant was degenerative joint disease, and hypertension. However, on examination, there was no edema in the extremities. Dr. Snyder noted that the claimant should continue her present medication (Exhibit 2F, page 9). On June 7, 2011, Dr. Snyder's report shows that the claimant presented for a follow up of right foot pain, neck pain, anxiety disorder, chronic pain syndrome, and hypertension, uncontrolled. On examination, the claimant was in no apparent distress. She was alert, oriented, and memory intact. There was some paraspinal tenderness, but there was no clubbing, cyanosis, or edema in the joint (Exhibit 2F, pp. 5-6).
>
> On July 28, 2011, Dr. Snyder's report shows that the claimant denied altered mental status and difficulty concentrating. The claimant admits to having anxiety, but denies depression, suicidal ideation, excessive anger, and behavioral problems. On examination, Dr. Snyder noted wellnourished, well developed, alert, and in no acute distress. Inspection of the neck showed normal appearance. The claimant 's right lower extremity demonstrated no joint or limb tenderness to palpation, no edema, and no ecchymosis. Dr. Snyder noted that heel-shin cerebellar test were within normal limits bilaterally, and heel-to-toe straight line walking normal (Exhibit 1F, pp. 13-I4). On September 19, 2011, the claimant underwent MRI of the lumbar spine, which revealed slight convex right scoliosis without acute findings. The claimant also underwent two views of the left shoulder, which revealed no acute abnormality (Exhibit 1F, pp. 22-23).
>
> On December 7, 2011, the claimant presented at Metrolina Medical Associates, with Rajesh Kedar, M.D. At this time, the claimant complained of neck pain, and right shoulder pain. The

claimant underwent two views of the right shoulder, which revealed normal right shoulder. She also underwent two views of the cervical spine, which showed cervical spondylosis and degenerative disc disease C5-7 (Exhibit 4F, page 8). On January 9, 2012, Dr. Kedar's assessment of the claimant was hypertension, NOS, anxiety state, unspecified, and chronic pain. However, Dr. Kedar's report shows that the claimant was negative for gait disturbance, and negative for psychiatric symptoms. She was positive for back pain, but negative for bone/joint symptoms and weakness. At this time, the claimant's blood pressure was 120/80. Physical examination reveals that the claimant demonstrates regular heart, rate, rhythm, with no edema present. There was no skeletal tenderness or deformity, and extremities appear normal, with no edema or cyanosis. From a psychological standpoint, Dr. Kedar noted that the claimant exhibited no unusual anxiety or evidence of depression (Exhibit 4F, pp. 5-6).

On March 7, 2012, the claimant underwent consultative examination, with Harriett R. Steinert, M.D. Dr. Steinert diagnosis of the claimant was anxiety, chronic neck and lumbar spine pain of uncertain etiology. However, Dr. Steinert noted that the claimant reported that she has anxiety, but denies depression. The claimant also mentioned that she has never been hospitalized for mental illness. She said that she used to see a therapist. Physical examination reveals that the claimant was well-nourished, well-developed, and in no acute distress. Dr. Steinert noted that the claimant was able to get on and off the examination table without difficulty. There is full range of motion of the cervical spine, and no tenderness to palpation of the neck. Dr. Steinert reported that the claimant demonstrates full range of motion of all joints in all four extremities.

Dr. Steinert's report shows that the claimant complained of pain with movement of her right shoulder and left knee. However, there is no tenderness to palpation of any joints, no swelling, no inflammation, and no deformity. There are no sensory or motor deficits, and no muscle atrophy. Dr. Steinert indicated that grip strength was normal and equal in both hands (5/5). Dr. Steinert stated that deep tendon reflexes are equal in all extremities. Dr. Steinert related that there is no pedal edema in either lower extremity. Dr. Steinert stated that there is no obvious scoliotic curvature of her spine. There is no tenderness to palpation of the spine or paraspinous muscles. Dr. Steinert reported that straight leg raises are negative

bilaterally. Dr. Steinert noted that the claimant was able to walk across the room without an assistive device with a normal gait. The claimant can walk on her toes and heels. Dr. Steinert indicated that the claimant is oriented to person, place, and time. Dr. Steinert further stated that the claimant is capable of handling her own personal finances and legal affairs (Exhibit 5F).

Since March 16, 2012, the claimant underwent routine and conservative treatments at North Central Family Medicine. Treatment notes show that the claimant received treatments for hypertension, degenerative disc disease, urinary incontinence, anxiety, and osteoarthritis. At this time, treatment notes show that the claimant's hypertension was controlled on Lisinopril (Exhibit 6F, page 7). Treatment notes on July 13, 2012 show that the claimant's lower back pain and anxiety were controlled (Exhibit 8F, page 5). On August 15, 2012, treatment notes show that the claimant's anxiety, lower back pain, and shoulder pain was treated, with medications and no adverse side effects. Treatment notes also show that the claimant's hypertension was controlled (Exhibit 10F, page 2). On May 1, 2013, treatment notes show that the claimant's lumbago, anxiety, hypertension, benign, bicipital tenosynovitis were all stable (Exhibit 10F, pp. 39-40). On August 21, 2013, all laboratory reports were essentially normal regarding the claimant's urine (see Exhibit 10F, pp. 66-68). Further records show that the claimant continued routine and conservative treatments for the above impairments, through at least February 3, 2014 (Exhibit 10F).

On January 27, 2014, the claimant presented at Novant Health Imaging, with complaints of neck pain. As a result, the claimant underwent x-rays of the cervical spine, which revealed two-level degenerative disc disease. The claimant also complained of pain in the joint involving the right shoulder. However, an x-ray of the right shoulder revealed a normal appearing right shoulder. Further, the claimant complained of lumbago. The claimant underwent x-rays of the lumbar spine, which revealed only mild facet arthrosis and minimal listhesis, and there was no other abnormality detected (Exhibit 11F).

[R. 17–19.]

With respect to Plaintiff's credibility, alleged pain, and his analysis of the medical evidence, the ALJ determined:

> The claimant testified that she is unable to work because of ear pain, and pain in middle of her back that radiates down to her legs. The claimant described this pain as a stabbing pain. She reported that she experiences pain in her neck into shoulders, arm sockets, and right arm is useless. The claimant mentioned that she is right handed. She drives six miles around Richburg, and goes to the grocery store. The claimant said she cannot lift a gallon of milk, cannot comb her hair, and cannot pull weeds. In addition, the claimant states that she has problems at night because of urinary incontinence.
>
> The claimant testified that she has problems with anxiety, and depression. She mentioned that she is scared in public. The claimant reports that she feels like she is dying. The claimant mentioned that she has crying spells until lunchtime.
>
> The claimant testified that she gets up about 7 am, does some housework, loads dishes in dishwasher, attempts to sweep, and goes grocery shopping. The claimant mentioned that she has problems with her left leg giving out so she cannot wash her hair well. She said she can dress, but needs help getting her clothes off at night. The claimant indicated that her medications make her tired. The claimant alleges that she has glaucoma in both eyes, and has no peripheral vision. The claimant indicated that she can sit in an office chair 15 or 30 minutes, can stand 5 minutes in one spot. According to the claimant, doctors state she can lift no more than 6 or 7 pounds.
>
> . . .
>
> The undersigned does not find the claimant's contentions concerning her inability to work entirely credible. The claimant's allegations are disproportionate to the clinical records and tests. The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. Although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature. After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's alleged depression, and anxiety, the evidence of record is inconsistent with the claimant's allegation of disability. Specifically, the claimant testified that she has problems with anxiety and depression. The claimant testified that she is scared in public, and has crying spells. However, in June 2011, treatment notes show that the claimant was in no apparent distress, as she was alert, oriented, and had intact memory (Exhibit 2F, pp. 5-6). In July 2011, Dr. Snyder noted that the claimant denied altered mental status and difficulty concentrating. She admitted to anxiety, but denied depression, suicidal ideation, excessive anger, and behavioral problems (Exhibit 1F, pp. 13-14). In January 2012, Dr. Kedar noted that the claimant demonstrated no unusual anxiety or evidence of depression (Exhibit 4F, pp. 5-6).

Additionally, the report of the consultative examiner, Dr. Steinert, shows that the claimant has anxiety, but denies depression. However, she has never been hospitalized for mental illness, and she used to see a therapist. Dr. Steinert indicated that the claimant is oriented to person, place, and time. Dr. Steinert further stated that the claimant is capable of handling her own personal finances and legal affairs (Exhibit 5F). Treatment notes in July 2012 show that the claimant's anxiety was controlled (Exhibit 8F, page 5). In August 2012, treatment notes reveal that the claimant's anxiety was treated with medications, with no adverse side effects (Exhibit 10F, page 2). Further, in May 2013, treatment notes reveal that the claimant's anxiety was stable (Exhibit 10F, pp. 39-40).

With regards to the claimant's allegations of osteoarthritis, and degenerative disc disease, they are inconsistent with the evidence of record. Specifically, the claimant testified that she was unable to work because of middle back pain that radiates down to her legs. She also testified that she has pain in her neck, shoulders, and right arm. However, in February 2011, treatment notes show that the claimant exhibited no edema in the extremities (Exhibit 2F, page 9). In July 2011, treatment notes show that the claimant's right lower extremity demonstrated no joint or limb tenderness to palpation, no edema, and no ecchymosis. The claimant's heel-shin

cerebellar test were within normal limits bilaterally, and heel-to-toe straight line walking normal (Exhibit 1F, pp. 13-14). On September 19, 2011, the claimant underwent MRI of the lumbar spine, which revealed slight convex right scoliosis without acute findings. The claimant also underwent two views of the left shoulder, which revealed no acute abnormality (Exhibit 1F, pp. 22-23).

In December 2011, two views of the right shoulder revealed normal right shoulder (Exhibit 4F, page 8). On January 9, 2012, treatment notes show that the claimant was negative for gait disturbance, and negative for bone/joint symptoms and weakness. There was no skeletal tenderness or deformity, and extremities appear normal, with no edema or cyanosis (Exhibit 4F, pp. 5-6). Consultative examiner, Dr. Steinert noted that the claimant was able to get on and off the examination table without difficulty. There is full range of motion of the cervical spine, and no tenderness to palpation of the neck, right shoulder, and knee. Dr. Steinert reported that the claimant demonstrates full range of motion of all joints in all four extremities. Dr. Steinert stated that deep tendon reflexes are equal in all extremities. There was no obvious scoliotic curvature of her spine, no tenderness to palpation of the spine or paraspinous muscles, and straight leg raises were negative bilaterally. The claimant was able to walk across the room without an assistive device with a normal gait, and able to walk on her toes and heels (Exhibit 5F).

Further records in July 2012 show that the claimant's lower back pain was controlled (Exhibit 8F, page 5). In August 2012, treatment notes reveal that the claimant's lower back pain and shoulder pain was treated with medications, and there was no adverse side effects (Exhibit 10F, page 2). In May 2013, treatment notes show that the claimant's lumbago and bicipital tenosynovitis was stable (Exhibit 10F, pp. 39-40). In January 2014, x-rays of the claimant's right shoulder revealed normal appearing right shoulder, and x-rays of the claimant's lumbar spine showed only mild facet arthrosis and minimal listhesis. Otherwise, there was no other abnormality detected (Exhibit 11F).

Regarding the claimant's allegations of urinary incontinence (night only), they are inconsistent with the evidence of record. There is little to no evidence in the record to support the claimant's allegations of the impairment alleged. However, it

was noted in August 2013, that all laboratory records were essentially normal regarding the claimant's urine testing (see Exhibits 10F, pp. 66-68).

With regards to the claimant's allegations of hypertension, they are inconsistent with the evidence of record. In January 2012, treatment notes show that the claimant's blood pressure was 120/80. On examination, she demonstrated regular heart, rate, and rhythm, with no edema present (Exhibit 4F, pp. 5-6). In March 2012, treatment notes show that the claimant's hypertension was controlled on Lisinopril (Exhibit 6F, page 7). Further, in May 2013, treatment notes show that the claimant's hypertension was benign and stable (Exhibit 10F, pp. 39-40).

Although the claimant testified and described her daily activities to be fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

[R. 17–21.]

The ALJ considered the opinion evidence of record as follows:

As for the opinion evidence, the undersigned considered the opinions of the State agency medical consultants who provided residual functional capacity assessments at the initial and reconsideration levels. While these opinions were reasonable, based on the evidence available at the time, additional evidence received into the record at the hearing level convinces the undersigned that the claimant was slightly more limited than originally determined (Social Security Ruling 96-6p).

[R. 21.]

The ALJ's conclusion was:

34

> In sum, the above residual functional capacity assessment is supported by the objective medical evidence of record (MER). The claimant has been found to have some mental issues, but these do not preclude routine, unskilled work activity and the performance of sustained repetitive tasks. The claimant is alleging disability as of May 1, 2011, yet the record consistently reports daily activity that indicates that the claimant has been capable of performing substantial work activity since that time. The undersigned finds that there is no documentation in the record that substantiates any assertion that the claimant's mental disorder and alleged physical problems cause her to be unable to perform all forms of substantial work activity.

[R. 21.]

### ALJ's consideration of Plaintiff's Difficulty Affording Treatment

Plaintiff argues the ALJ violated SSR 16-3p by "reliance on [Plaintiff's] 'conservative' treatment as a rationale for discounting [Plaintiff's] claims, without any inquiry into the reasons for the treatment selected, seemed to have affected the ALJ's remaining analyses, requiring remand." [Doc. 15 at 1.] Also, Plaintiff argues that her treatment was not "conservative." [*Id*.]  The Commissioner contends the ALJ properly considered Plaintiff's conservative treatment as one factor; and, if there was error in failing to discuss her inability to afford treatment, it is harmless.  The Court agrees with the Commissioner.

### *Discussion*

SSR 16-3p[10] provides, "When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following: . . . An individual may not be able to afford treatment and may not have access to free or low-cost medical services. .

---

[10]Plaintiff originally relied on SSR 96-7p, that was in effect at the time of the ALJ's decision, but has been superseded by SSR 16-3p. [Doc. 14 at 6 n.2.] Both parties agree that the former and current regulation contain similar language concerning the Commissioner's duty to consider whether the claimant may not be able to afford treatment or have access to free or low-cost medical services. [*See* Docs. 14, 15.]

. . We will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. We will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them." *Id.*, 2016 WL 1119029, at *6. And, courts have found that a claimant's inability to afford care may be a sufficient reason for failing to seek treatment. *See King v. Colvin*, C/A No. 6:12-3043-TMC, 2014 WL 906795, at *2 (D.S.C. March 7, 2014) (explaining that if the ALJ incorrectly interpreted the factor regarding inability to afford care, it may be harmless where the ALJ would have reached same result).

Plaintiff is correct that the medical evidence in the record indicates several times that she could not afford certain tests or treatment, such as an MRI, eye examination, injection to treat pain, and that a certain prescription may have been helpful when Plaintiff could obtain insurance. And, it appears that in his decision the ALJ did not acknowledge and discuss the fact that Plaintiff could not afford those certain tests or treatments. Further, the ALJ found Plaintiff's testimony of severe pain with resulting physical limitations was somewhat incredible because it was disproportionate to the clinical records and tests; and, he did not entirely believe Plaintiff's pain allegations because her treatment was "essentially routine and/or conservative in nature." Plaintiff contends that this error by the ALJ affected all of his analyses and requires remand.

From a reading of the ALJ's entire discussion, the Court finds that any error by the ALJ in failing to discuss and consider Plaintiff's failure to pursue additional tests and treatments due to her finances is harmless error in this case. The ALJ found Plaintiff's RFC to be light work with additional restrictions based on the oftentimes relatively normal

findings on the tests that had been performed and the examinations by medical personnel. And, the ALJ placed more restrictions on Plaintiff's RFC than did the only medical opinion evidence in the record. Specifically, the ALJ explained that Plaintiff's lumbar spine radiological tests showed no acute abnormalities; her left shoulder had no acute abnormality; and her right should was normal. And, the ALJ determined that the doctor's appointments showed that her back and shoulder pain was treated and controlled with prescription medicine, and there was no adverse side effects; her extremities appeared normal with no edema. Also, the ALJ explained that although Plaintiff testified about depression, at her appointments Plaintiff would deny depression. Thus, the ALJ considered other factors when determining the RFC; he did not rely solely on Plaintiff's routine and conservative treatment.

Additionally, the record contains no medical opinion evidence offered by any of Plaintiff's treating physicians with regard to her physical and mental limitations, or evidence related to why certain unaffordable tests were needed to demonstrate her alleged severe limitations, or that more *aggressive* treatment was needed but unaffordable. Thus, substantial evidence supports the ALJ's mention that Plaintiff's medical evidence was relatively weak in support of her alleged degree of limitations; and, to the extent the ALJ erred by failing to discuss her inability to afford more medical care, Plaintiff has not carried the burden to show why the error cannot be considered harmless. *See Bazar v. Colvin*, C/A No. 9:14-537-TMC, 2015 WL 1268012, at *11 (D.S.C. March 19, 2015) (failure to discuss the plaintiff's inability to afford additional treatment was harmless where the ALJ did not determine the RFC based solely on the plaintiff's lack of treatment but noted it as one of several factors).

37

With respect to Plaintiff's contention that the ALJ should not have characterized her treatment as "conservative" because prescription medications and injections to control pain are not "conservative" measures[11], the Court notes that Plaintiff seems to use this argument to assert that the ALJ's credibility determination was error. [*See* Doc. 18 at 22.] In other words, Plaintiff may be arguing that the ALJ wrongfully interpreted her failure to seek more aggressive medical treatment as a reason to discount her credibility where Plaintiff had a reason for her failure to seek aggressive treatment—her inability to afford it. However, Plaintiff's failure to seek further medical treatment was one factor considered by the ALJ, but not the only factor. As discussed above, the ALJ relied on the results of the objective medical tests and examinations being relatively normal as a primary reason to discount Plaintiff's testimony about her alleged functional limitations. The ALJ also noted that Plaintiff's alleged limited daily activities could not be objectively verified with any reasonable degree of certainty. [R. 21.] For example, Plaintiff did not have another witness testify about her daily activities. Therefore, even if the ALJ erred by labeling her treatment as "conservative," Plaintiff does not offer any evidence as to how that error may have harmed her. *See Bazar v. Colvin*, C/A No. 9:14-537-TMC, 2015 WL 1268012, at *2 (D.S.C. March 19, 2015). The Court finds that the ALJ's consideration of Plaintiff's credibility was reasonable and is supported by substantial evidence.

---

[11]In the response brief, Plaintiff asserts that there is a split among courts about whether narcotic medications and injections are "conservative" treatments. [Doc. 15 at 5.] This Court need not decide whether the ALJ should have used the phrase "conservative" treatment in this case because as explained herein the ALJ considered other factors.

**Notations in Medical Records that Plaintiff was Stable and Controlled**

Plaintiff alleges that the ALJ erred by discounting Plaintiff's testimony (finding it not entirely credible) based on notations in medical records that she was stable and her impairments were controlled. The Commissioner contends the ALJ properly relied on notations that Plaintiff's impairments were stable and controlled when considering Plaintiff's credibility; and, if there was error, it is harmless. The Court agrees with the Commissioner.

### *Discussion*

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor. But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

The medical evidence in the record contained notations that Plaintiff's impairments at certain times were "stable" or "controlled." Plaintiff contends the ALJ could not rely on that to discount her testimony related to her functional limitations caused by pain. However, as discussed above, the ALJ considered several factors when weighing the credibility of Plaintiff; her credibility was not decided based solely on those notations in the

39

medical record.  And, the ALJ certainly was supposed to weigh any of the evidence in the record.  The Court finds that substantial evidence supports the ALJ's determination of Plaintiff's credibility.  Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).

**Combination of Impairments**

Plaintiff alleges the ALJ erred by failing to consider all of Plaintiff's severe and non-severe impairments in combination when determining the RFC.  The Commissioner contends the ALJ properly considered the combination of all of Plaintiff's impairments in the RFC determination.  The Court agrees with the Commissioner.

*Discussion*

The Administration has provided a definition of RFC and explained what a RFC assessment accomplishes:

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC

> assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. . . .

SSR 96–8p, 61 Fed.Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted).

The statutory and regulatory process for making disability determinations, as interpreted by the Fourth Circuit, requires the ALJ to consider and adequately explain his evaluation of the combined effect of the impairments in determining the claimant's disability status. *See Reid v. Comm'r*, -F.3d-, 2014 WL 4555249, at *4–5 (4th Cir. Sept. 16, 2014); *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989); *Rabon v. Astrue*, C/A No. 4:08-3442-GRA, 2010 WL 923857 (D.S.C. Mar.9, 2010) (requiring remand when ALJ did not consider severe and nonsevere impairments in combination). Even if the claimant's impairment or impairments in and of themselves are not "listed impairments," the Commissioner must also "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id*.

The Commissioner's duty to consider the combined effect of Plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue throughout the disability process in accordance with 20 C.F.R. § 404.1523 which provides as follows:

41

> *Multiple Impairments*. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

*Id*.; *see also Fleming v. Barnhart*, 284 F. Supp. 2d 256, 270 (D.Md. 2003) ("The ALJ is required to assess the combined effect of a claimant's impairments throughout the five-step analytical process.") Courts in this district have found the ALJ's discussion and analysis adequate where a reading of the decision as a whole makes clear that the ALJ considered the combination of impairments. *See Brown v. Astrue*, C/A No. 0:10-1584-RBH, 2012 WL 3716792, at *6–7 (D.S.C. Aug. 28, 2012) (holding the decision as a whole makes clear that the Commissioner considered the combined effect of a claimant's impairments); *Thornsberry v. Astrue*, C/A No. 4:08-4075-HMH-TER, 2010 WL 146483, at *5 (D.S.C. Jan.12, 2010) (finding "while the ALJ could have been more explicit in stating that his discussion dealt with the combination of [the plaintiff's] impairments, his overall findings adequately evaluate the combined effect of [the plaintiff's] impairments.").

Although Plaintiff argues that the ALJ did not consider the cumulative effect of Plaintiff's impairments on her ability to work, the ALJ reviewed each alleged impairment and concluded that Plaintiff's alleged "mental disorder and alleged physical problems" did not substantiate her claims that she could not perform all forms of substantial work activity. [R. 21.] This statement itself shows that the ALJ did consider the combination. And, upon

review of the entire RFC discussion, the Court finds that the ALJ did sufficiently discuss and consider all of Plaintiff's severe and non-severe impairments in combination. The ALJ considered the combination of impairments and sufficiently accounted for them in the RFC, which he made more restrictive than the medical opinion evidence did. And, Plaintiff has not satisfied her burden of pointing out which impairments were not considered by the ALJ in the RFC discussion, or how the RFC would have been different if the combination properly had been considered. Therefore, substantial evidence supports the ALJ's decision. *See Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983) (through the fourth step, the burden of production and proof is on the claimant).

## CONCLUSION AND RECOMMENDATION

Wherefore, based on the foregoing, it is recommended that the decision of the Commissioner be affirmed.

**IT IS SO RECOMMENDED**.


December 7, 2016                          s/Jacquelyn D. Austin
Greenville, South Carolina              United States Magistrate Judge